ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| | | |
|---|---|---|
| **NORIS JOEL GAUTIER MORALES Y OTROS**<br>DEMANDANTE(S)- APELANTE(S)<br><br>V.<br><br>**AUTORIDAD DE ENERGÍA ELÉCTRICA DE P.R. Y OTROS**<br>DEMANDADA(S)- APELADA(S) | **KLAN202500295** | *APELACIÓN*<br>procedente del Tribunal de Primera Instancia, Sala Superior de **CAROLINA**<br><br>Caso Núm.<br>**CA2020CV02158**<br>(402)<br><br>Sobre:<br>Daños y Perjuicios |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y la Juez Barresi Ramos.

*Barresi Ramos*, juez ponente

**S E N T E N C I A**

En San Juan, Puerto Rico, hoy día 6 de mayo de 2026.

Comparecen ante este Tribunal de Apelaciones, los señores **NORIS JOEL GAUTIER MORALES** y **CHRISTIAN GAUTIER MORALES** (señores **GAUTIER MORALES**) mediante *Alegato Inicial de la Parte Demandante Apelante* incoado el 8 de abril de 2025. En su escrito, nos solicitan que revisemos la *Sentencia* decretada el 10 de enero de 2025 por el Tribunal de Primera Instancia (TPI), Sala Superior de Carolina.[1] En dicha decisión, el foro apelado declaró no ha lugar a la *Demanda* encausada el 13 de octubre de 2020 por los señores **GAUTIER MORALES**.

Exponemos el trasfondo fáctico y procesal que acompañan a la presente controversia.

---

[1] Este dictamen judicial fue notificado y archivado en autos el 14 de enero de 2025. Apéndice del *Alegato Inicial de la Parte Demandante Apelante,* págs. 109-118.

Número Identificador:  SEN2026_____

## - I -

El 13 de octubre de 2020, los señores **NORIS JOEL GAUTIER MORALES**, **CHRISTIAN GAUTIER MORALES** y **SORELIS GAUTIER MORALES** (señores **GAUTIER MORALES**) interpusieron una *Demanda* sobre daños y perjuicios en contra de la **AUTORIDAD DE ENERGÍA ELÉCTRICA DE P.R. (A.E.E.)**, **JUANA DOE**, **JUAN DOE** y **COMPAÑÍA ASEGURADORA A**.[2] En su causa de acción, expusieron que el señor **NORIS JOEL GAUTIER MORALES** se encontraba limpiando la parte posterior del patio de su hogar, cuando un pedazo de hormigón de un poste eléctrico, perteneciente a la **A.E.E.**, le cayó en la cabeza, fracturándole el cráneo y provocando que se quedara inconsciente por más de medio minuto. Acotaron que la **A.E.E.** tenía conocimiento que el poste no era seguro puesto que, posterior al huracán María, estuvieron trabajando en ese poste, comprometiéndose a cambiarlo; el lugar donde se accidentó el señor **NORIS JOEL GAUTIER MORALES** no había sido restringido por la **A.E.E.**, ni había nada que le avisara del peligro existente; la parte demandada creó una situación irrazonablemente peligrosa al tener su poste en las condiciones en que se encontraba y; debido a la culpa o negligencia solidaria de la parte demandada sufrieron daños. Con respecto a los daños, el señor **NORIS JOEL GAUTIER MORALES** reclamó una partida de $180,000.00; el señor **CHRISTIAN GAUTIER MORALES** y la señora **SORELIS GAUTIER MORALES** reclamaron cada uno $15,000.00 por perjuicios y profundas angustias mentales. Pidieron, además, las costas, gastos del caso, intereses legales y una suma razonable para los honorarios de abogado.

A los pocos días, el 23 de octubre de 2020, los señores **GAUTIER MORALES** presentaron su *Primera Demanda Enmendada* a los efectos de incluir: "6. La Autoridad de Energía Eléctrica, es auto-asegurada ("self

---

[2] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 1-3.

insured") o sea, actúa y es su propia compañía de aseguradora en casos donde se le reclaman partidas como las del presente caso".[3]

El 22 de enero de 2021, la **A.E.E.** presentó su *Contestación a Demanda Enmendada* conteniendo sus defensas afirmativas.[4] Adujo, entre otros, que después del huracán María, la **A.E.E.** envió personal para trabajar en reestablecer el servicio eléctrico, sin embargo, no surgía del registro que hubiesen despachado personal a reparar el poste objeto de controversia. Negó que el referido poste fuera de su pertenencia, por lo que no respondían por él. De esta manera, invocó la desestimación de la *Demanda* y se impusiera costas, gastos y honorarios de abogado a su favor. Asimismo, apuntó en sus *Defensas Afirmativas*:

> 12. De entenderse que la demandada incurrió en algún tipo de negligencia, lo cual expresamente se niega, los demandantes incurrieron en un grado sumamente considerable de negligencia comparada y/o contribuyente.
> 13. Cualquier compensación que el Honorable Tribunal entienda le deba ser concedida al demandante a raíz del accidente alegado en la demanda enmendada debe ser reducida de conformidad con el porciento de negligencia contribuyente incurrida por el demandante.

Luego de varios trámites procesales, el 17 de mayo de 2021, las partes conjuntamente presentaron el *Informe para el Manejo de Caso*.[5]

Tras lo cual, el 22 de junio de 2021, los señores **GAUTIER MORALES** presentaron su *Segunda Demanda Enmendada* con el propósito de añadir lo siguiente:[6]

> 3. La Urb. Los Colobos Park, se desarrolló como una urbanización de control de acceso a principio de la década de los 90 y contó con el correspondiente endoso de la A.E.E.
> 4. La Urb. Los Colobos Park, por ley y después de tener la aprobación de la AEE, le cedió a esta última TODAS las instalaciones eléctricas de la urbanización. Ello, incluye y no se limita a los cables, postes, transformadores y servidumbres de paso.
> 5. El poste eléctrico que nos ocupa, lo estuvo utilizando la AEE por más de 20 años, antes del Huracán María. Por ese poste pasaban los cables de la AEE hacia otros vecindarios. Cuando

---

[3] *Íd.*, págs. 4-6. De la *Demanda* no variaron los hechos ni las alegaciones esenciales excepto se añadió este inciso 6.
[4] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 7-10.
[5] *Íd.*, págs. 11-15.
[6] *Íd.*, págs. 16-18.

había que cambiar la bombilla del poste o hacer una reparación, el camión de la AEE entraba por la propiedad del vecino (don Heriberto) y con uno de sus empleados en la canasta del brazo hidráulico procedían con las reparaciones necesarias.

6. El Huracán María, provocó que el poste que nos ocupa se partiera y los cables de la AEE quedaron, en parte, sobre la verja de metal de la propiedad de la parte demandante, electrificándola.

7. Se tuvo que llamar a la AEE para que arreglaran la situación del cable vivo que estaba sobre la verja del demandante y el suelo.

8. La AEE, llegó hasta el poste que nos ocupa en uno de sus camiones que habían visitado el área anteriormente, uno de sus empleados se montó en el canasto del brazo hidráulico, alcanzó los cables eléctricos, los cortó y se comprometieron a regresar para cambiar el poste. Al día de hoy, todavía la A.E.E. no ha vuelto pasar por el área; ello, a pesar de las múltiples gestiones que se han realizado.

9. Una de las razones por la cual entre los vecinos coordinaban para limpiar el área es que la yerba crecía muy alta, los roedores se criaban en ese espacio y a veces entraban a los hogares. En los últimos años antes del presente accidente, raras veces la A.E.E[.] se ocupó de ese pedazo de terreno que es su servidumbre.

10. La A.E.E., tenía conocimiento que su poste no era seguro, pero no atendió la situación como lo hubiese hecho el hombre razonablemente prudente de nuestra sociedad. La A.E.E. cortó los cables vivos, se fue y nunca regresó a atender su poste ni el área.

11. El lugar donde se accidentó el codemandante, Sr. Gautier Morales, no había sido restringido por la A.E.E. ni había nada que avisara del peligro existente.

12. La parte demandada, creó una situación irrazonablemente peligrosa al tener su poste o el poste del que se hizo cargo y utilizó por más de 20 años, en las condiciones en que se encontraba y dicha parte sabía o debió de haber tenido conocimiento que era previsible que un accidente como el que nos ocupa acaeciera.

Así las cosas, el 20 de julio de 2021, la **A.E.E.** presentó su *Contestación a Segunda Demanda Enmendada*.[7] Replicó que el poste objeto de controversia no es de su propiedad, ni tiene servidumbre alguna sobre el terreno donde ubica el poste; no existe registro de que la **A.E.E.** haya utilizado el poste por veinte (20) años antes del Huracán María, ni que aparezca en el diagrama de postes y líneas de la **A.E.E.**; no envió personal a reparar el poste en

[7] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 19-23.

controversia; y no incurrió en ningún acto, omisión culposa o negligente por la cual deba responder. Dado lo mencionado, suplicó la desestimación, con perjuicio, de la *Demanda*, así como la imposición de costas, gastos, y honorarios de abogados.

En un momento posterior, el 19 de abril de 2022, se celebró la audiencia sobre el estado de los procedimientos.[8] Allí la representación legal de la **A.E.E.** reseñó haber dialogado con su cliente y haber hecho gestiones con LUMA, pues le indicaron que la **A.E.E.** ya no tiene ningún tipo de documentos. El tribunal de instancia concedió un término de quince (15) días para contestar el interrogatorio previamente cursado a los señores **GAUTIER MORALES**. Pautó fecha para la Conferencia con Antelación a Juicio, así como coordinó la reunión entre abogados para la confección del informe.

El 17 de mayo de 2022, la señora SORELIS GAUTIER MORALES presentó un *Aviso de Desistimiento, Sin Perjuicio, de la Causa de Acción de la Sorelis Gautier Morales, Únicamente Solicitud que se Elimine a la Sra. Sorelis Gautier Morales como Testigo de la Parte Demandante* en la cual acreditó no desear continuar con su reclamo.[9]

Pasado un tiempo, el 20 de junio de 2023, las partes presentaron conjuntamente un *Informe de Conferencia con Antelación a Juicio*.[10] Eventualmente, el 10 de septiembre de 2024, los señores **GAUTIER MORALES** presentaron *Moción Informativa en Cuanto a Informe de la Policía y Comparecencia del Policía Samuel Navarro a Juicio* en la cual advirtieron que las partes habían acordado marcar el *Informe Policiaco* como exhibit y excusar al agente Samuel Navarro como testigo.[11]

El 23 de septiembre de 2024, las partes presentaron *Moción Conjunta Respecto a Prueba Documental* dilucidando haber logrado acuerdos sobre fotografías del catastro digital (9 fotos) y diagrama de postes y líneas de

---

[8] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 24-25.
[9] *Íd.*, pág. 26.
[10] *Íd.*, págs. págs. 38-70. Dicho informe fue el que rigió los procedimientos.
[11] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, pág. 71.

**A.E.E.** Exhortaron que fuese marcada dicha prueba documental como estipulada (Exhibit).[12]

Ese mismo día, el foro primario decretó *Orden* declarando *ha lugar* la *Moción Conjunta Respecto a Prueba Documental*, aprobando los acuerdos y autorizando marcar como Exhibit estipulados de ambas partes.[13]

El juicio en su fondo se celebró los días 24, 25 y 26 de septiembre de 2024; y 1 y 2 de octubre de 2024. Allí se ofrecieron los testimonios de: señor Heriberto Rivera; señora María de los Ángeles Rodríguez; ingeniero Octavio Rivera Reyes; doctor Glenn J. Garayalde Cotroneo; señor **Noris Joel Gautier Morales**; señor **Christian J. Gautier Morales**; licenciado Leonel Santa Crispín; agrimensor Luis Maldonado Pérez; ingeniero Víctor Ruíz Pérez; y señor Efraín Laboy Colón.

### Testimonio del señor Heriberto Rivera

Informó vivir en la Urbanización Los Colobos Park, desde hace aproximadamente 17 años.[14] Afirmó conocer al señor **Noris Joel Gautier Morales**, por ser vecino suyo y llevarse muy bien con este.[15] Atestiguó que, detrás de la casa del señor **Noris Joel Gautier Morales** hay un terreno que limpiaban para que no se les metieran las sabandijas, ni los ratones para dentro de la casa.[16] Esgrimió que, tuvieron acceso al lugar porque detrás de su residencia hay un portón.[17] Narró que el 3 de noviembre de 2019, aproximadamente a la 1:00 de la tarde, estaba limpiando el área junto al señor **Noris Joel Gautier**, **Christian Gautier Morales** –hijo de **Noris Joel Gautier Morales**–, Heriberto Rivera –su hijo mayor–, y Esteban Rivera –su hijo menor–, como siempre hacían una vez al mes, cuando el señor **Noris Joel Gautier Morales** tuvo un accidente.[18] Alegó que, a uno de los postes de la **A.E.E.**, que se había caído con el huracán María, se le desprendió un pedazo de cemento o piedra, tamaño peñón, de un pie y medio más o menos, posiblemente de 30 a 40 libras, y le cayó en la cabeza al señor **Noris Joel Gautier Morales**.[19] Explicó que, después de recibir ese golpe, el señor **Noris Joel Gautier Morales** cayó al piso y perdió el conocimiento.[20] Acotó que el señor **Noris Joel Gautier Morales** comenzó a botar mucha sangre, y estaba aturdido, por lo que lo transportaron al hospital.[21] Detalló que el señor **Noris Joel Gautier Morales** tenía una herida abierta en el cráneo de dos a tres pulgadas.[22] Recordó que, para el huracán María, el poste de

---

[12] *Íd.*, págs. 72-73.
[13] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, pág. 74.
[14] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 13, líneas 3-12.
[15] *Íd.*, pág. 13, líneas 15-24.
[16] *Íd.*, pág. 15, líneas 1-12; pág. 18, líneas 1-5.
[17] *Íd.*, pág. 15, líneas 18-23.
[18] *Íd.*, pág. 15, líneas 1-12; pág. 17, líneas 17-25; pág. 29, líneas 24-25; pág. 30, líneas 1-4; pág. 34, líneas 14-21.
[19] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 15, líneas 13-17; pág. 19, líneas 8-21; pág. 30, líneas 8-25; pág. 52, líneas 20-25; pág. 53, líneas 1-2.
[20] *Íd.*, pág. 19, líneas 22-25.
[21] *Íd.*, pág. 20, líneas 1-23.
[22] *Íd.*, pág. 20, líneas 24-25; pág. 51, líneas 22-25.

referencia cayó en la verja de *cyclone fence* que quedaba en la parte posterior de la propiedad del señor **NORIS JOEL GAUTIER MORALES**, luego de sus linderos, y como tenía electricidad, su esposa llamó a la **A.E.E.**[23] Expuso que, estos cortaron la línea del poste anterior para quitarle la corriente a ese poste.[24] Añadió, que en algún momento la **A.E.E.** indicó que regresarían a recoger el poste, es decir, a cortarlo y sacarlo de la propiedad de **NORIS JOEL GAUTIER MORALES**, pero no regresaron.[25] Señaló que la **A.E.E.** obtenía acceso al poste porque este le daba entrada por el portón que queda en la parte de atrás de su residencia, para que ellos cambiaran la bombilla o fotoceldas y la **A.E.E.** conocía que ellos mantenían el área limpia.[26] Agregó que, a simple vista, se podía observar que el poste estaba deteriorado.[27] No obstante, expresó que ya el poste de referencia no existe porque alguien lo demolió, y no fue por su residencia que entraron a tumbarlo.[28]

### Testimonio de la señora María de los Ángeles Santos Rodríguez

Relató que reside con el señor Heriberto Rivera desde hace veintiséis (26) años.[29] Así, testificó que hizo gestiones con relación al poste en controversia, tales como realizar reclamaciones para que lo fueran a reparar, y porque dicho poste de cemento estaba deteriorado y partido.[30] Agregó que, posterior al huracán María, solicitó la remoción del poste dado que se quebró.[31] Manifestó que la **A.E.E.** iba con su camión grande y reparaban el poste desde la calle, y cuando iban en un camión pequeño, pasaban a través de su patio.[32] Arguyó que dicho solar donde ubica el poste en controversia pertenece a la urbanización, y el poste pertenece a la **A.E.E.**[33] Afirmó tener una acera en ese terreno ajeno, para colocar a su perro y una vez al mes su esposo Heriberto con sus hijos y Chris limpiaban el área.[34]

### Testimonio del ingeniero Octavio Rivera Reyes

Sostuvo ser ingeniero eléctrico desde el año 1976 y haber trabajado en algún tiempo con la **A.E.E.**[35] Narró que, su labor diaria consistía en inspeccionar trabajos de construcción eléctricas de línea aérea y patrullar líneas, en cuanto a que tuvieran maleza o un deterioro en postes o en las líneas.[36] Testificó cómo se colocaba la electricidad en una urbanización para la década de los 1990, época en que se desarrolló la urbanización donde el señor **NORIS JOEL GAUTIER MORALES** se accidentó.[37] Declaró que el poste en controversia es un poste octagonal y dichos postes no tienen la misma resistencia que los postes primarios, que son los postes cuadrados grandes.[38] Manifestó que, los postes octagonales, ya sea por el medio ambiente, o algún tipo de contacto con tierra, puede suceder que las varillas cojan moho, se corroan por dentro y se agriete el poste, pudiendo ocasionar que se

---

[23] *Íd.*, pág. 15, líneas 24-25; pág. 16, líneas 1-8; pág. 25, líneas 7-25; pág. 26, líneas 1-25; pág. 27, líneas 1-4.
[24] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 16, líneas 5-8; pág. 27, líneas 5-22; pág. 40, líneas 14-25.
[25] *Íd.,* pág. 18, líneas 17-25; pág. 19, líneas 1-2.
[26] *Íd.*, pág. 16, líneas 15-25; pág. 18, líneas 6-16; pág. 30, líneas 5-7.
[27] *Íd.*, pág. 35, líneas 9-24.
[28] *Íd.*, pág. 19, líneas 3-7; pág. 33, líneas 2-25; pág. 34, líneas 1-13.
[29] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 55, líneas 1-13.
[30] *Íd.*, pág. 57, líneas 9-15; pág. 60, líneas 6-22.
[31] *Íd.*, pág. 57, líneas 9-15.
[32] *Íd.*, pág. 57, líneas 16-21.
[33] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 67, líneas 9-20.
[34] *Íd.*, pág. 69, líneas 10-25; pág. 70, líneas 1-5.
[35] *Íd.*, pág. 72, líneas 21-23; pág. 1-6.
[36] *Íd.*, pág. 73, líneas 7-25.
[37] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 74, líneas 12-25; pág. 75; pág. 76, líneas 1-5.
[38] *Íd.*, pág. 76, líneas 6-25.

derrumbe, y caigan pedazos.[39] Opinó que, si el poste en controversia estaba conectado a los otros dos postes (P1 y P2), automáticamente pertenecía a la **A.E.E.**[40] Afirmó que, todo lo que está conectado al sistema eléctrico, ya sea ahora de LUMA o lo que era antes la **A.E.E.** es responsabilidad de LUMA y de la **A.E.E.**[41] Señaló que el mantenimiento de esas líneas, así como la reparación, le correspondía a la **A.E.E.**[42] Añadió que, una vez la **A.E.E.** adquiere una servidumbre, la **A.E.E.** no tiene que pedir permiso a nadie para montar o quitar un poste y no todos los postes y cables eléctricos están debidamente registrados en la **A.E.E.**[43] Explicó que, los postes le pertenecen a la **A.E.E.** dependiendo la ubicación.[44] Aclaró que, si el poste está en terreno privado, le pertenece al dueño del terreno, no obstante, se puede realizar un procedimiento para que un poste en terreno privado le pertenezca a la **A.E.E.**[45]

### Testimonio del doctor Glenn J. Garayalde Cotroneo

Testificó ser médico desde el año 1977, y contar con una especialidad en neurología.[46] Aseveró que su función como neurólogo consistía en evaluar enfermedades o afecciones del sistema nervioso central y periférico, entiéndase cerebro y cordón espinal, al igual que el sistema musculo esqueletal.[47] Relató que, fue profesor de neurología en la Universidad de Puerto Rico; neurólogo por cuarenta (40) años en el Hospital de Veterano; médico consultor del Hospital Metropolitano; perito en neurología de la Comisión Industrial por los últimos veinte (20) años y; en la actualidad se dedicaba a la práctica privada de la neurología.[48] Refirió haber conocido al señor **NORIS JOEL GAUTIER MORALES** el día de su evaluación, en su oficina.[49] Apuntó que le realizó una evaluación neurológica de su condición.[50] Describió el contenido de su informe, sobre el suceso que le comunicó el señor **NORIS JOEL GAUTIER MORALES.**[51] Indicó que de la evaluación que se le realizó en el hospital al señor **NORIS JOEL GAUTIER MORALES** tras el accidente se le diagnosticó con una fractura en el cráneo con sangría dentro del cráneo, por lo que, le refirieron a una evaluación neuroquirúrgica.[52] Expuso que, el cráneo es una entidad ósea, con varios huesos unidos por diferentes suturas y contiene el cerebro, la estructura más importante del cuerpo.[53] Afirmó que, en el caso del señor **NORIS JOEL GAUTIER MORALES** el impacto del poste de cemento en su cabeza fracturó ese hueso y produjo una depresión en el cráneo.[54] Además, al señor **NORIS JOEL GAUTIER MORALES** se le realizó un CT Scan que mostró que había sangre en el área intracraneal, lo cual demostró la severidad del golpe sufrido.[55] Reseñó que, posterior al accidente, el señor **NORIS JOEL GAUTIER MORALES** le informó que había sangrado por el área donde le colocaron puntos, había tenido dolor localizado en el área del golpe, había sufrido dolores de cabeza, así como mareos y, también había presentado

---

[39] *Íd.*, pág. 76, líneas 6-25; pág. 77, líneas 1-6.
[40] *Íd.*, pág. 85, líneas 3-11.
[41] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 24 de septiembre de 2024, pág. 85, líneas 8-25; pág. 86, líneas 1-25.
[42] *Íd.*, pág. 85, líneas 8-25; pág. 86, líneas 1-25.
[43] *Íd.*, pág. 94, líneas 11-25.
[44] *Íd.*, pág. 96, líneas 4-16.
[45] *Íd.*, pág. 96, líneas 16-25; pág. 97, líneas 1-25; pág. 98, líneas 1-25.
[46] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 7, líneas 14-23.
[47] *Íd.*, pág. 7, líneas 22-25; pág. 8, líneas 1-5.
[48] *Íd.*, pág. 8, líneas 11-21.
[49] *Íd.*, pág. 9, líneas 7-11.
[50] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 9, líneas 6-25; pág. 10, líneas 1-7.
[51] *Íd.*, pág. 10, líneas 8-25; págs. 11-30.
[52] *Íd.*, pág. 10, líneas 22-25; pág. 11, líneas 1-10.
[53] *Íd.*, pág. 11, líneas 11-23.
[54] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 11, líneas 11-23.
[55] *Íd.*, pág. 11, líneas 24-25; pág. 12, líneas 1-17.

visión borrosa y náuseas.[56] Agregó que, los síntomas del señor **NORIS JOEL GAUTIER MORALES** eran compatibles con la lesión sufrida.[57] Atisbó que cuando a este último se le examinó el cráneo, encontraron que tenía una irregularidad deprimida en la parte superior del cráneo y tenía una lesión hiperémica.[58] Manifestó que dichos términos se referían a un área deprimida y roja en el cerebro, y esa era el área donde recibió el golpe por el cual le cogieron puntos y por donde sangraba espontáneamente.[59] Esgrimió que, como consecuencia del golpe recibido, el señor **NORIS JOEL GAUTIER MORALES** tenía un ocho por ciento de impedimento de las funciones del cuerpo.[60] Detalló sobre la capacidad de los neurólogos para interpretar los informes de los radiólogos, y procedió a analizar el informe radiológico.[61]

### Testimonio del señor Noris Joel Gautier Morales

Identificó su propiedad ubicada en la Calle Almendro FF-1, los Colobos Park 601.[62] Exteriorizó que a dicha propiedad le realizó arreglos, tales como hacerle la verja y hacerle una verja de *cyclone fence* en el remanente de la parte de atrás.[63] Relató que la implementación de la verja en el remanente de la parte de atrás se debió a que el pasto crecía muy alto, las personas se metían al patio y los ratones, ardillas y sabandijas siempre se le metían para su casa.[64] Reveló que dentro de ese pedazo que extendió hacia el remanente tenía dos (2) perros para que el patio se mantuviera limpio y no se metieran sabandijas hacia la casa.[65] Asintió conocer que dicho solar no le pertenecía y era una propiedad ajena.[66] Informó sobre un accidente que tuvo en 1991, en el cual una plancha le cayó en la parte posterior de la cabeza.[67] Contó que en esa ocasión lo llevaron al hospital, le hicieron placas y a los dos días le dieron de alta, sin recibir tratamiento médico adicional.[68] Intentó conseguir ese expediente, pero ni el Centro Médico, ni el Fondo lo tenían.[69] Dijo que el 3 de noviembre de 2019 se encontraba en la parte de atrás de su urbanización cuando tuvo un accidente con un poste de Energía Eléctrica.[70] Recordó que estaba limpiando junto a su hijo, el vecino y los hijos del vecino en la parte de atrás de la urbanización para que las sabandijas no se metieran a su casa y se encontraba cerca del poste cuando ocurrió el accidente.[71] Alegó no recordar cómo se sentía cuando despertó y después del accidente lo llevaron al hospital de Carolina.[72] Especificó no recordar nada de su traslado del lugar de los hechos al hospital de Carolina.[73] Atisbó que, en dicho hospital le tomaron puntos y luego lo trasladaron a Centro Médico donde le hicieron un CT scan de la cabeza.[74] Expuso que, cuando estaba en Centro Médico tenía mucho dolor de cabeza, específicamente en el área donde tenía el golpe.[75] Indicó que

---

[56] *Íd.*, pág. 16, líneas 13-25; pág. 17; pág. 18.

[57] *Íd.*, pág. 18, líneas 12-25; pág. 19, líneas 1-8.

[58] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 18, líneas 1-10.

[59] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 21, líneas 11-24; pág. 22, líneas 1-19.

[60] *Íd.*, pág. 28, líneas 6-25; pág. 29, líneas 1-25; pág. 30, líneas 1-11.

[61] *Íd.*, pág. 71, líneas 4-25; págs. 72-81.

[62] *Íd.*, pág. 82, líneas 12-25.

[63] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 83, líneas 13-25.

[64] *Íd.*, pág. 83, líneas 13-21.

[65] *Íd.*, pág. 83, líneas 22-25; pág. 84, líneas 1-4; pág. 128, líneas 16-25.

[66] *Íd.*, pág. 125, líneas 12-25.

[67] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 84, líneas 5-13.

[68] *Íd.*, pág. 84, líneas 8-25.

[69] *Íd.*, pág. 83, líneas 17-19.

[70] *Íd.*, pág. 85, líneas 11-19.

[71] *Íd.*, pág. 85, líneas 11-22.

[72] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 85, líneas 20-25; pág. 86, líneas 1-6.

[73] *Íd.*, pág. 86, líneas 7-9.

[74] *Íd.*, pág. 86, líneas 10-23.

[75] *Íd.*, pág. 86, líneas 24-25; pág. 87, líneas 1-4.

estuvo allí tres (3) días, le hicieron estudios de la cabeza, lo dejaron en observación, y le dieron pastillas para el dolor.[76] Enunció que, dicho área de la cabeza se le quedó hundida como consecuencia del peñón del poste que le cayó encima.[77] Desplegó que, el poste de referencia tenía un foco y se partió cuando el huracán María, cayendo encima de la verja y ocasionando que esta quedara electrificada.[78] Aseveró que, la **A.E.E.** fue en un camión identificado con su logo a quitar los cables y estos prometieron volver a eliminar el poste.[79] Sostuvo que, cada vez que el poste se dañaba venía la **A.E.E.** a repararlo.[80] Amplió que, a simple vista se podía observar que el poste estaba quebrado, pero que no representaba un peligro para ellos.[81] Resaltó que él llamaba para que lo eliminaran.[82] Con respecto al día del accidente, aludió que se encontraba realizando tareas livianas, como pasar el rastrillo, junto a su hijo, el hijo menor de Heriberto, Heriberto y no recordaba si el hijo mayor de Heriberto también se encontraba allí.[83] Comunicó que, dicho grupo se encargaba de cada treinta (30) días pasar la máquina de recortar grama, el *trimmer*, un tractor, rastrillo y el machete, todo ello sin recibir paga alguna.[84] Comentó que, después del accidente con el poste, tiene visión borrosa, dificultad para permanecer sentado, para escuchar bien, así como para dormir, puesto que despertaba gritando.[85]

### Testimonio del señor Christian J. Gautier Morales

Manifestó ser hijo del señor **NORIS JOEL GAUTIER MORALES** y la señora Zoé Morales.[86] Reseñó que, el 3 de noviembre de 2019, su padre tuvo un accidente mientras limpiaban las áreas verdes que estaban cerca de la casa de su padre.[87] Indicó que, se encontraba recortando las áreas verdes en el tractor, cerca de su papá, cuando un bloque del poste de la **A.E.E.** le cayó en la cabeza.[88] Dijo que, inmediatamente, con la ayuda del señor Eric fue a levantar a su papá del piso y poner las toallas para montarse en el vehículo, para así llevarlo al Doctor's Hospital de Carolina.[89] Agregó que, ese trayecto hacia el hospital fue eterno debido al sangrado por la cabeza que presentó su papá.[90] Exteriorizó haber sentido que perdería a su padre al verlo botar tanta sangre por la cabeza y al este reaccionar después de minuto y medio.[91] Aportó que, una vez llegaron al hospital, a su papá lo montaron en una camilla y lo pasaron a verificarle la herida para entonces cogerle puntos.[92] Amplió que, después lo llevaron a hacer exámenes y le encontraron que tenía un pequeño sangrado en la cabeza y fractura en el cráneo, por lo que le dijeron que había que trasladarlo en ambulancia al Hospital Centro Médico.[93] Señaló que, en Centro Médico mantuvieron a su papá en observación y le dijeron que lo tenían que operar, pero

---

[76] *Íd.*, pág. 93, líneas 24-25; pág. 94, líneas 1-7.

[77] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 87, líneas 2-6; pág. 88, línea 20-23.

[78] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 88, líneas 24-25; pág. 89, líneas 1-7 y 24-25.

[79] *Íd.*, pág. 89, líneas 8-25.

[80] *Íd.*, pág. 91, líneas 23-25; pág. 93, líneas 5-6.

[81] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 139, líneas 7-25; pág. 140, líneas 1-16.

[82] *Íd.*, pág. 140, líneas 10-16.

[83] *Íd.*, pág. 93, líneas 7-12.

[84] *Íd.*, pág. 93, líneas 13-23. *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 6, líneas 15-21.

[85] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 25 de septiembre de 2024, pág. 98, líneas 22-25; pág. 99, líneas 1-5; pág. 100, líneas 7-11.

[86] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 22, líneas 1-11.

[87] *Íd.*, pág. 22, líneas 23-24; pág. 23, líneas 1-6.

[88] *Íd.*, pág. 23, líneas 3-10; pág. 32, líneas 6-15.

[89] *Íd.*, pág. 23, líneas 11-16; pág. 35, líneas 14-24.

[90] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 23, líneas 23-25; pág. 24, líneas 1-11.

[91] *Íd.* pág. 23, líneas 17-22.

[92] *Íd.*, pág. 24, líneas 12-16.

[93] *Íd.*, pág. 24, líneas 17-25.

que al tercer día le explicaron que no lo operarían por cómo podía quedar después de la operación.[94] Aludió que, su padre estuvo recluido en Centro Médico durante tres días, y este junto a su hermana y madre –ex esposa de su papá– lo cuidaron.[95] Denotó que, posterior al alta, se llevó a su padre a vivir junto a él y su esposa, para así ofrecerle los cuidados necesarios, dado que este necesitaba ayuda casi en todo.[96] Depuso que, durante esas primeras semanas su papá se veía mal, este le decía que los dolores de cabeza eran insoportables y tenía que mantener la luz apagada porque la vista y la cabeza le molestaban.[97] Comentó que hablando su papá se le iba, es decir, que se espaciaba, cosa que no le sucedía antes del accidente del poste.[98] Verbalizó que, tuvo que pedir dos semanas en el trabajo para poder atender a su padre, sin tener los días y cuando se agotaron esas dos semanas su esposa se quedó con su papá.[99] Desplegó que, la recuperación de su papá no había sido muy buena; este tiene que estar días encerrado en el cuarto a oscuras; le cambia el humor a veces por el dolor; no puede ir solo a sus citas porque no se acuerda de lo que los médicos le dijeron; y su papá no se acuerda de las conversaciones que tuvieron.[100] Aseveró que, su miedo era ver a su papá mal, y cómo este pudiera terminar realmente.[101] Narró que posterior al accidente del poste, su padre era una persona totalmente diferente; su memoria no estaba igual; antes no tenía sueños que le provocaran levantarse gritando; ahora tenía limitaciones para conducir; y no podía hacer muchas cosas que hacía antes.[102] Con respecto al poste, afirmó que este se encontraba estillado, pero que para el momento no representaba un riesgo porque ya habían hecho varias veces el patio.[103] Esbozó que dicho poste le pertenecía a la **A.E.E.**, se encontraba en una propiedad ajena y no tenían autorización del dueño para entrar al predio para darle mantenimiento.[104] Externalizó que el dolor de espalda de su papá no era nuevo puesto que era una condición previa, pero que luego del accidente del poste se le empeoró.[105] Añadió que su papá también presentaba *tinnitus* desde el accidente de 1991 y todas las condiciones se le agravaron con el accidente del poste.[106] En lo que respecta a tratamientos psicológico o psiquiátricos, puntualizó que ni su papá, ni él estaban recibiendo tratamiento alguno.[107]

### Testimonio del licenciado Leonel Santa Crispín

Cercioró ser abogado desde hace treinta y cinco (35) años aproximadamente, y laborar en la actualidad como Director de Asuntos Jurídicos en la **A.E.E**.[108] Previo a dicho puesto, fue abogado de la División de Litigación durante un aproximado de once (11) años, entiéndase desde 1996 hasta 2007-2008.[109] Adicionó que conoce bastante bien la **A.E.E.** puesto que llevaba veintiocho (28) años trabajando para esta.[110] Confirmó que sus iniciales y firma aparecían en el Exhibit (#5) de la parte demandante –Contestaciones al

---

[94] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 25, líneas 22-25; pág. 26, líneas 1-2.
[95] *Íd.*, pág. 96, líneas 3-8.
[96] *Íd.*, pág. 96, líneas 9-22.
[97] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 96, líneas 23-25; pág. 97, líneas 1-5.
[98] *Íd.*, pág. 27, líneas 2-12.
[99] *Íd.*, pág. 28, líneas 1-12.
[100] *Íd.*, pág. 28, líneas 13-25; pág. 29, líneas 1-2.
[101] *Íd.*, pág. 29, líneas 3-8.
[102] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 29, líneas 9-25.
[103] *Íd.*, pág. 33, líneas 24-25; pág. 34, líneas 1-11.
[104] *Íd.*, pág. 34, líneas 12-20; pág. 38, líneas 4-25; pág. 39, líneas 1-9.
[105] *Íd.*, págs. 40-42.
[106] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 43, líneas 18-25; pág. 44, líneas 1-13.
[107] *Íd.*, pág. 46, líneas 12-21.
[108] *Íd.*, pág. 50, líneas 1-18.
[109] *Íd.*, pág. 50, líneas 19-24.
[110] *Íd.*, pág. 50, línea 25; pág. 51, líneas 1-5; pág. 55, líneas 3-9.

Requerimiento de Admisiones por parte de la **A.E.E.**--.[111] Respondió que desconocía cómo tenía electricidad, pero que, en sus años de experiencia, podía decir que esas cosas pasaban, solo que no eran costumbre.[112] Advirtió que, lo que define si las instalaciones eléctricas pasan a la **A.E.E.** es si hay una constitución de servidumbre de líneas eléctricas.[113] Planteó no saber si en la Urbanización Los Colobos había una servidumbre o no.[114]

### Testimonio del agrimensor Luis Maldonado Pérez

Profirió ser agrimensor licenciado, graduado de la Universidad Politécnica de Puerto Rico en 1992.[115] Comentó que trabajó 21 años para la **A.E.E.**, de los cuales catorce (14) años fungió como agrimensor y siete (7) años como supervisor del catastro de bienes inmuebles.[116] Expresó que actualmente labora para LUMA Energy de Puerto Rico como líder del área de récord de terrenos.[117] Su función es ser custodio de todos los documentos de adquisición de los derechos reales de la **A.E.E.**, así como certificar los anchos de servidumbre y o la titularidad de inmuebles que están en pleno dominio.[118] Examinó un documento titulado Certificación marcado como Exhibit Número uno (#1) de la **A.E.E.** y reconoció que este fue emitido por su oficina y firmado por sí.[119] Especificó sobre los hallazgos para emitir la certificación de referencia.[120] El primer hallazgo fue que la propiedad no estaba afectada por servidumbre de paso a favor de la **A.E.E.** dado que dichas servidumbres del sistema de transmisión de esa urbanización discurrían por el dominio público de las calles.[121] Completó que el poste en controversia estaba fuera de lo que se refiere al perímetro de la finca donde se desarrolló el proyecto.[122] Pormenorizó que, el referido poste no estaba en la Urbanización Los Colobos, ni en Parque Ecuestre, por lo que le levantó sospecha sobre a quién pertenecía.[123] Buscó el plano de la Urbanización Parque Ecuestre y se percató que la ubicación del poste queda en un área que estaba dedicada a la futura relocalización de la carretera 874.[124] Ponderó que no podía razonablemente con evidencia fehaciente decir que pertenecía a un sistema eléctrico u otro y por ello preparó una certificación negativa.[125] Reafirmó que el poste en controversia no constituye una servidumbre de la **A.E.E.**.[126] Aseguró que, el hecho de que un poste tuviese luminaria no implicaba automáticamente que este pertenecía a la **A.E.E.**, puesto que cuando la **A.E.E.** recibe el sistema de distribución primaria, secundaria y de alumbrado, pertenece a la finca donde fue desarrollada la urbanización.[127] Apuntaló que en Puerto Rico existen conexiones eléctricas de la **A.E.E.** que no aparecen en los programas que utilizó y si la **A.E.E.** usa un poste para sus líneas, es responsabilidad de la **A.E.E.** darle mantenimiento a ese poste.[128]

---

[111] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 26 de septiembre de 2024, pág. 53, líneas 15-25; pág. 54.

[112] *Íd.*, pág. 59, líneas 3-25; pág. 60; pág. 67, líneas 22-25; pág. 68; pág. 69, líneas 1-6.

[113] *Íd.*, pág. 60.

[114] *Íd.*, pág. 61, líneas 20-25; pág. 62, líneas 1-21.

[115] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 7, líneas 9-25; pág. 8, líneas 1-7.

[116] *Íd.*, pág. 8, líneas 13-22.

[117] *Íd.*, pág. 8, líneas 8-25; pág. 9, líneas 1-8.

[118] *Íd.*, pág. 9, líneas 9-25.

[119] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 10, líneas 6-25; pág. 11; pág. 12, líneas 1-10.

[120] *Íd.*, pág. 12, líneas 11-25.

[121] *Íd.*, pág. 12, líneas 16-21.

[122] *Íd.*, pág. 12, líneas 22-24; pág. 13, líneas 1-25.

[123] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 13, líneas 16-25; pág. 14, líneas 1-9.

[124] *Íd.*, pág. 13, líneas 16-25; pág. 14, líneas 1-9.

[125] *Íd.*, pág. 13, líneas 16-25; pág. 14, líneas 1-9.

[126] *Íd.*, pág. 16, líneas 20-24.

[127] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 22, líneas 22-25; pág. 23; pág. 24, líneas 1-3.

[128] *Íd.*, pág. 25, líneas 6-10; pág. 28, líneas 11-15.

---

**Testimonio del ingeniero Víctor Ruíz Pérez**

Expresó ser ingeniero eléctrico graduado en 1980 del Colegio de Agricultura y Artes Mecánicas de Mayagüez.[129] Aseveró ostentar un *minor* en *Power* dentro del bachillerato y en Diseño de Iluminación, así como poseer licencia desde 1985-1986 como ingeniero profesional.[130] Además, posee una certificación de un curso avanzado de ingeniería de distribución ofrecido por la Westinghouse y un certificado de análisis sistemático de accidentes provisto por el International Control Institute de Atlanta, Georgia.[131] Trabajó para la **A.E.E.** un aproximado de treinta (30) años como ingeniero supervisor, supervisor de líneas tres, ingeniero de distrito, ingeniero de área, y Director Regional Interino, entre otros.[132] Esbozó que trabajando para la **A.E.E.** tomó cursos en diseño de líneas de distribución y transmisión.[133] Pormenorizó que cuando se jubiló de la **A.E.E.** comenzó a trabajar como perito en reconstrucción de accidentes de contacto eléctrico, interpretación de códigos, de incendios, de accidentes de vehículos, y de interpretación de códigos.[134] Distinguió que la **A.E.E.** se dedica a generar, distribuir y vender electricidad, y no vende postes eléctricos, ni de alumbrado.[135] La **A.E.E.** conecta a su sistema eléctrico el alumbrado de las vías y carreteras.[136] Aclaró que los postes que se encuentran en áreas boscosas o inaccesibles al público en general, no se conectan a la **A.E.E.**, puesto que no cumplen con la definición de lo que es público.[137] Esgrimió que "[l]a autoridad no diseña sistemas de alumbrado, pero sí es custodio de las normas y procedimientos de alumbrado público. Si alguien va a diseñar un sistema de alumbrado, tienen que utilizar las normas establecidas por la Autoridad, y hay manuales para eso. Y se llama así, Normas de Alumbrados Públicos."[138] Procedió a explicar en detalle cómo una persona que va a hacer un proyecto de urbanización, cómo es que se desarrolla e instalan postes, y cómo eso pasa a la **A.E.E.**[139] En resumen, una vez el contratista somete el proyecto a la **A.E.E.** y este es aceptado por la **A.E.E.**, se llena un documento titulado *Sesión, Traspaso y Garantía* donde el contratista le traspasa el poste a la **A.E.E.** para que esta lo opere, le de mantenimiento y garantía del sistema eléctrico.[140] Profundizó que, en la Urbanización Los Colobos no hay servidumbre de paso de la **A.E.E.** para dar mantenimiento a los postes, porque la servidumbre la comparte con la carretera, pero sí existe una sesión.[141] Enfatizó que el área donde ubica el poste no es de utilidad pública porque de haber una luminaria instalada allí, lo que iluminaba era el patio del señor **NORIS JOEL GAUTIER MORALES**, la casita de perro que había allí atrás y nada más.[142] Advirtió que solar donde está el poste marcado como P3 es una futura relocalización de la carretera 874.[143] Verificó en el CRIM sobre el dueño del terreno y no aparecía dueño alguno.[144] Aclaró que, si un poste

---

[129] *Íd.*, pág. 29, líneas 8-23.

[130] *Íd.*, pág. 29; pág. 30, líneas 1-4.

[131] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 30, líneas 5-12.

[132] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 30, líneas 13-25; pág. 31, líneas 1-4.

[133] *Íd.*, pág. 30, líneas 5-12.

[134] *Íd.*, pág. 31, líneas 5-13. No habiendo objeción de la parte demandante, el señor Víctor Ruíz Pérez procedió a declarar como perito en materia de electricidad. *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 33, líneas 15-24.

[135] *Íd.*, pág. 35, líneas 24-25; pág. 36, líneas 1-7.

[136] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 36, líneas 17-25; pág. 37, líneas 1-13.

[137] *Íd.*, pág. 37, líneas 14-20.

[138] *Íd.*, pág. 39, líneas 14-20.

[139] *Íd.*, pág. 40, líneas 18-25; págs. 40-45.

[140] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 45, líneas 20-25'pág. 46.

[141] *Íd.*, pág. 49, líneas 21-25; pág. 50, líneas 1-19.

[142] *Íd.*, pág. 55, líneas 10-25; pág. 56, líneas 1-12.

[143] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 68, líneas 21-25.

[144] *Íd.*, pág. 69, líneas 4-9.

tiene cable eléctrico perteneciente a la **A.E.E.**, o alumbrado de la **A.E.E.**, no le corresponde a la **A.E.E.** darle mantenimiento.[145]

### Testimonio del señor Efraín Laboy Colón

Acreditó haber trabajado durante veintisiete (27) años para la **A.E.E.**, ocupando puestos como técnico de instrumentación electrónica; auxiliar de ingeniería en diseño eléctrico; auxiliar de ingeniería en estudios estimados; supervisor de construcción; supervisor de líneas; oficial de adiestramiento y; jefe del despacho de distrito.[146] Especificó que al presente labora como Gerente de Distrito de LUMA desde octubre de 2021.[147] Divulgó que, la función de su oficina es mantener el sistema eléctrico veinticuatro (24) horas al día, los siete días de la semana.[148] Atienden las querellas de los abonados de sectores sin servicio, clientes sin servicio, problemas de fluctuaciones de voltaje, situaciones de peligro, y toda situación que tengan los abonados del sistema eléctrico con relación a la operación normal diaria.[149] Su oficina también puede emitir certificaciones de sectores y servicios que no hayan sido atendidos, así como sobre transferencias de cargas y sobre los trabajos que realizan, entre otras más.[150] Afianzó que, para este caso en particular emitió una certificación.[151] Explicó que de acuerdo a la información y recopilación de datos, determinaron que la línea ubicada en un solar baldío entre los Colobos Park y Parque Ecuestre no era parte de su sistema eléctrico.[152] Exteriorizó que al personarse al lugar observó que la instalación era una fuera de los estándares de lo que normalmente construyen, y le parecía que esa línea nunca pasó a la **A.E.E.**[153] Aludió que, a la fecha de su visita, la condición del poste en controversia era deplorable.[154]

Más tarde, el 1 de noviembre de 2024, la **A.E.E.** presentó *Memorando Post-Sentencia.*[155] En este, razonó que los señores **GAUTIER MORALES** fallaron en probar que la **A.E.E.** tenía un deber legal y, a causa de ello, la **A.E.E.** no era responsable de los daños procurados en la *Demanda*. Por eso, imploró la desestimación por insuficiencia de prueba.

En la misma fecha, los señores **GAUTIER MORALES** consignaron *Moción en Cumplimiento de Orden y Memorando de Derecho.*[156] Estos controvirtieron que la **A.E.E.** realizó actos de dominio sobre el poste en controversia, y lo utilizó como propietario. Especificaron que la prueba demostró que la **A.E.E.** era responsable del poste y, por ende, de los daños ocasionados por este. A

---

[145] *Íd.*, pág. 83, líneas 16-24.
[146] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 2 de octubre de 2024, pág. 6, líneas 11-25; pág. 7.
[147] *Íd.*, pág. 6.
[148] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 8, líneas 3-6.
[149] *Íd.*, pág. 8, líneas 7-14.
[150] *Íd.*, pág. 8, líneas 15-21.
[151] *Transcripción de la Prueba Oral (TPO)* de la audiencia celebrada el 1 de octubre de 2024, pág. 8, líneas 22-25; pág. 9, líneas 18-25; pág. 10, líneas 1-22.
[152] *Íd.*, pág. 11, líneas 11-25.
[153] *Íd.*, pág. 12, líneas 7-19.
[154] *Íd.*, pág. 26; pág. 34, líneas 9-25; pág. 35; pág. 36, líneas 3-25.
[155] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 75-88.
[156] *Íd.*, págs. 89-108.

tono con lo antes expuesto, rogaron se condenará a la **A.E.E.** al pago de los daños ocasionados y se le encontrará incurso en temeridad por presentar prueba contraria a los documentos estipulados.

Finalmente, el 10 de enero de 2025, se dictó la *Sentencia* apelada. Esta contiene las siguientes determinaciones de hechos:

1. El 3 de noviembre de 2019, los demandantes, el Sr. Rivera Brito, sus hijos Heriberto y Esteban, estaban deshierbando y limpiando el remanente de terreno que está aledaño a sus hogares, en la Urb. Los Colobos. El Sr. Rivera Brito estaba cerca de Noris Joel, a 3 o 4 pies de distancia, cuando un pedazo de hormigón del Poste #3, que estaba partido por la mitad, perteneciente a la AEE, y donde la AEE había tenido su alumbrado y cables, le cayó sobre la cabeza de Noris Joel;[157]

2. El accidente por el cual el Sr. Noris Joel sufrió un daño ocurrió a la 1 pm del 3 de noviembre de 2019.[158]

3. La Autoridad de Energía Eléctrica, es auto-asegurada ("self insured"), o sea, actúa y es su propia compañía aseguradora en casos donde se le reclaman partidas como las del presente caso.[159]

4. Cuando el Sr. Noris Joel, recibió el golpe en la cabeza con el pedazo de hormigón que cayó del poste, perdió el conocimiento inmediatamente. Este señor quedó inconsciente por aproximadamente treinta (30) segundos;[160]

5. El Sr. Noris Joel y su hijo Christian Gautier estaban realizando tareas de mantenimiento en terreno ajeno sin permiso del dueño del terreno. La prueba desfilada en el juicio no demostró que el terreno fuera una extensión de la propiedad de los demandantes, según lo testificado por el Sr. Heriberto Brito y la propia víctima del accidente.[161]

6. El Sr. Noris Joel construyó en el terreno donde ocurrió el accidente una verja de cyclone fence, sin permiso del dueño del terreno y sabiendo que este era ajeno, según su propio testimonio provisto en el juicio en su fondo, según lo testificado por el Sr. Heriberto Brito y la propia víctima del accidente.[162]

7. Antes del accidente del Sr. Noris Joel, la AEE llevaba más de una década realizando actos de dominio respecto al poste que impactó a la víctima, donde ubica su alumbrado y la bombilla;[163]

8. La única prueba que presentó la AEE con el propósito de alegar que las líneas no eran propiedad de ellos, es la Certificación de LUMA anejada al expediente.[164] La AEE no presentó ningún testigo de conocimiento que contradijera los actos de dominio que esta entidad realizó como codemandada.[165]

9. El Sr. Rivera Brito transportó a el Sr. Noris Joel, al Hospital Regional de Carolina, con el propósito de que recibiera atención médica inmediata.[166] En este hospital le tomaron placas de Rayos

---

[157] Entrada núm. 115, pág. 8; Entrada núm. 84, pág. 1.
[158] Entrada núm. 84, pág. 1.
[159] Entrada núm. 84, pág. 2.
[160] Entrada núm. 115, pág. 10.
[161] Entrada núm. 114, pág. 10; Grabación día 1 del juicio en su fondo; Grabación día 2 del juicio en su fondo; Grabación día 3 del juicio en su fondo.
[162] *Íd.*, pág. 10; Grabación día 1 del juicio en su fondo; Grabación día 2 del juicio en su fondo; Grabación día 3 del juicio en su fondo.
[163] Entrada núm. 115, pág. 8.
[164] *Íd.* pág. 8; Entrada núm. 97, anejo 3;
[165] *Íd.* pág. 8.
[166] *Íd.* pág. 10.

X, al Sr. Noris Joel y concluyeron que tenía una fractura craneal por lo que lo transfirieron en ambulancia al Centro Médico, en Río Piedras, Puerto Rico;[167]

10. El Sr. Noris Joel, estuvo tres (3) días en Centro Médico bajo observación, por motivo de su fractura craneal.[168] Los médicos consideraron realizarle al Sr. Noris Joel, una intervención quirúrgica, para corregir el daño en el cráneo pero no se la realizaron por entender que los riesgos eran mayores que los beneficios;[169]

11. Durante el tratamiento médico posterior a los días que estuvo en sala de emergencias, el Sr. Noris Joel, recibió la atención del codemandante Christian Gautier y otros familiares;[170] Christian Gautier como hijo de la víctima tuvo que dedicar largas horas al cuidado de su padre;[171]

12. Según el neurólogo, el Dr. Garayalde quién es el perito provisto por los demandantes, el Sr. Noris Joel sufrió un sangrado intracraneal donde había sangre entre el cerebro y las membranas que cubre el cerebro.[172] Según este médico, este sangrado no es peligroso[,] pero demuestra que fue un golpe severo;[173]

13. El Dr. Garayalde certificó que el Sr. Gautier sufrió un traumatismo craneoencefálico el 3 de noviembre de 2019 con pérdida de conciencia y hemorragia levé.[174] Esta enfermedad resultó en una lesión cerebral traumática con un deterioro integral de 8%.[175]

En esencia, determinó que: (1) la causa adecuada del daño fue la negligencia del señor **NORIS JOEL GAUTIER MORALES**; (2) la prueba desfilada en el juicio demostró que el señor **NORIS JOEL GAUTIER MORALES** sabía que el terreno donde daba mantenimiento era ajeno, y este tenía disponible otros cursos de acción para resolver el problema de la yerba del terreno; (3) los actos de los [señores **GAUTIER MORALES**] de penetrar en domicilio ajeno sin consentimiento del dueño y fijar una verja ilegalmente en terreno ajeno pudieron configurar el delito de usurpación; (4) la **A.E.E.** tenía un deber jurídico de darle mantenimiento al poste, por haber realizado actos de dominio por más de una década; (5) no se desfiló prueba de que la **A.E.E.** incumpliera con su deber jurídico de darle mantenimiento a los postes y eso causara la caída del pedazo de hormigón que golpeó al señor **NORIS JOEL GAUTIER MORALES**; (6) la negligencia de la **A.E.E.** fue ínfima en comparación

---

[167] *Íd.*, págs. 10-11.
[168] *Íd.*, pág. 12.
[169] *Íd.*, pág. 12.
[170] *Íd.*, pág. 11.
[171] *Íd.*, pág. 11.
[172] *Íd.*, pág. 13.
[173] *Íd.*, pág. 13; Entrada núm. 84, pág. 3; Grabación día 2 del juicio.
[174] *Íd.*, págs. 13 y 14; Grabación día 2 del juicio.
[175] *Íd.*, pág. 14; Grabación día 2 del juicio.

con la negligencia de los [señores **GAUTIER MORALES**], por lo que se eximiría a la **A.E.E.** de responsabilidad al aplicar la doctrina de absorción de culpas; (7) el accidente sufrido por el señor **NORIS JOEL GAUTIER MORALES** no pudo ser previsto por la **A.E.E.**; (8) la causa decisiva del daño fue su propia negligencia de ubicarse con su hijo, el señor **CHRISTIAN GAUTIER MORALES**, en terreno ajeno, sin permiso del dueño; (9) la persona prudente y razonable no se ubicaría en terreno ajeno a realizar ningún tipo de acto, mucho menos cuando ve un poste que es un peligro para la seguridad; (10) la posible negligencia de la **A.E.E.** es desproporcionalmente mínima en comparación con la negligencia crasa del señor **NORIS JOEL GAUTIER MORALES** de penetrar en domicilio ajeno con conocimiento que no era suyo, por lo que no procede aplicar la negligencia comparada.

Inconforme, el 29 de enero de 2025, los señores **GAUTIER MORALES** presentaron *Solicitud de Determinaciones de Hechos y de Derecho Adicionales Moción de Reconsideración*.[176] Subrayaron que:

> Respetuosamente, el hecho que el Sr. Gautier Morales carecía de permiso del dueño del terreno baldío no suprime que la AEE fue negligente al no brindarle el mantenimiento requerido a su Poste #3 y dejarlo en las condiciones en que se encontraba. Más cuando la AEE sabía que los vecinos limpiaban regularmente el área.

> La AEE fue temeraria al negar que el Poste #3 le pertenecía. El asumir esa postura, fue un acto que obligó a la parte demandante a contratar a un perito ingeniero y dedicarle parte del juicio para probar que dicho Poste #3, le pertenecía. Respetuosamente, la parte demandante, entiende que la AEE fue temeraria y, además de declarar ha lugar la demanda, debería de imponerle el pago de honorarios de abogado.

A modo de réplica, el 28 de febrero de 2025, la **A.E.E.** presentó *Moción en Oposición a Solicitud de Determinaciones de Hechos y de Derechos Adicionales y a Moción de Reconsideración*.[177] La **A.E.E.** se opuso a las determinaciones de hechos adicionales, y refutó que la solicitación era improcedente.

---

[176] Apéndice del *Alegato Inicial de la Parte Demandante Apelante*, págs. 119-129.
[177] *Íd.*, págs. 131-146.

El 7 de marzo de 2025, el foro primario dictaminó *Resolución* declarando no ha lugar a la *Solicitud de Determinaciones de Hechos y de Derecho Adicionales Moción de Reconsideración* y confirmó la *Sentencia*.[178]

Ante ello, el 8 de abril de 2025, los señores **GAUTIER MORALES** acudieron ante este foro intermedio revisor, mediante *Apelación* señalando el(los) siguiente(s) error(es):

> Erró gravemente en derecho el Honorable Tribunal de Primera Instancia al no imponerle responsabilidad a la Autoridad de Energía Eléctrica de P.R., por los hechos probados durante el juicio y desestimar, con perjuicio, la segunda demanda enmendada del presente caso.

> El Honorable Tribunal de Primera Instancia, cometió error manifiesto de derecho al tomar en consideración hechos irrelevantes e impertinentes al presente caso e ignorar lo más importante que se probó durante el juicio y que establece la responsabilidad de la Autoridad de Energía Eléctrica de P.R. por los daños de los demandantes apelantes.

El 10 de abril de 2025, pronunciamos *Resolución* reglamentando los procedimientos para la reproducción de la prueba oral, entre otras cosas.

Evaluado concienzudamente el expediente del caso, habiéndole dado la debida consideración a la transcripción de la prueba oral (TPO) y contando con el beneficio de la comparecencia de ambas partes, nos encontramos en posición de adjudicar. Puntualizamos las normas de derecho pertinentes a la(s) controversia(s) planteada(s).

- II -

- A - *DAÑOS Y PERJUICIOS*

"El que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización".[179] Esto supone que, para que prospere una reclamación por daños y perjuicios se requiere la concurrencia de tres (3) elementos básicos, los cuales tiene que probar la parte demandante: 1) la

---

[178] *Íd.*, pág. 147.

[179] Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA § 5141. Los hechos que dan lugar a la presente controversia ocurrieron el **3 de noviembre de 2019**, antes de que se aprobara el nuevo Código Civil de Puerto Rico de 2020.

presencia de un daño físico o emocional en el reclamante; 2) haya surgido a raíz de un acto u omisión culposa o negligente de la parte demandada, y 3) exista un nexo causal entre el daño sufrido y dicho acto u omisión.[180]

El concepto de *daño* ha sido definido mediante jurisprudencia como todo aquel menoscabo material o moral que sufre una persona, ya sea en sus bienes vitales naturales, en su propiedad o en su patrimonio, causado en contravención a una norma jurídica y por el cual ha de responder otra.[181] En cambio, la *negligencia* consiste en no precaver las consecuencias lógicas de una acción u omisión que cualquier persona prudente y razonable hubiese previsto bajo las mismas circunstancias.[182] Dicho deber de *previsibilidad* se refiere a todo daño probable, no a todo daño posible.[183]

Por último, la relación causal alude al vínculo entre la acción u omisión y el daño.[184]

En cuanto al deber de **previsibilidad**, este es el criterio central de la responsabilidad extracontractual.[185] Por lo tanto, un daño no generará una causa de acción por *negligencia* si dicho daño no fue previsto, ni pudo haber sido razonablemente anticipado por una persona prudente y razonable.[186] En aquellos casos en los cuales se alegue que el daño es producto de una *omisión*, es requisito demostrar la existencia de un deber de actuar, su incumplimiento y que de haberse cumplido se habría evitado el daño.[187]

Entre las defensas que puede levantar una persona demandada por daños y perjuicios, se encuentra la **asunción de riesgo**.[188] En términos generales, este principio implica que la parte demandante que, expresa o implícitamente, consintió a exponerse a sufrir daños como consecuencia de un riesgo creado por la parte demandada, queda impedido de recobrar los

---

[180] *Colón y otros v. K-Mart y otros,* 154 DPR 510, 517 (2001).
[181] *Santini Rivera v. Serv. Air, Inc.*, 137 DPR 1, 7 (1994).
[182] *López v. Porrata Doria*, 169 DPR 135, 164 (2006).
[183] *Montalvo v. Cruz*, 144 DPR 748, 756 (1998).
[184] *Nieves Díaz v. González Massas,* 178 DPR 820, 844–845 (2010).
[185] *Colón y otros v. K-Mart y otros, supra.*
[186] *Íd.*
[187] *Administrador v. ANR*, 163 DPR 48, 59 (2004).
[188] *Viñas v. Pueblo Supermarket*, 86 DPR 33, 37 (1962).

daños sufridos.[189] Para ello, la prueba deberá establecer que la parte demandante reconoció el riesgo y que lo asumió voluntariamente.[190] La *asunción de riesgo* "[t]iene dos (2) acepciones: la primaria, en la que existe un deber limitado de cuidado por la parte demandada, y la secundaria, que propiamente se configura como una manifestación de negligencia comparada."[191] Dicha doctrina de **negligencia comparada** atenúa proporcionalmente la responsabilidad de la parte demandada de acuerdo con el grado de negligencia desplegado por la parte demandante que contribuyó a la producción de sus propios daños.[192]

Por todo ello, para determinar la *negligencia* que corresponde a cada parte es necesario analizar y considerar la totalidad de las circunstancias que mediaron en el caso, particularmente si una de las causas es predominante.[193] Cuando es evidente la desproporción entre culpas causantes de un daño, la mayor absorbe totalmente la otra y excluye la aplicación de la norma de *negligencia comparada*, aplicándose así la doctrina de **absorción de culpa**.[194]

### - B - *APRECIACIÓN DE LA PRUEBA*

Cuando se evalúa la *apreciación de la prueba* desfilada ante el Tribunal de Primera Instancia, como regla general, se le reconoce amplia deferencia a las determinaciones de hechos que formula el honorable Juez de instancia.[195] En esa misma dirección, es menester fundamentar que la Regla 42.2 de las de Procedimiento Civil de 2009 implanta que las determinaciones de hechos que contempla el foro de instancia a base de los testimonios orales "no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida

---

[189] C.J. Irizarry Yunqué, *Responsabilidad Civil Extracontractual*, 7ma ed., San Juan, 2009, pág. 275.
[190] *Id.*
[191] *Urbino v. San Juan Racing Assoc., Inc.*, 141 DPR 210, 218 (1996).
[192] *Colón Santos v. Coop. Seg.*, 173 DPR 170, 178 (2008).
[193] *Velázquez v. Ponce Asphalt*, 113 DPR 39, 47 (1982); *Méndez Purcell v. A.F.F.*, 110 DPR 130, 135-136 (1980).
[194] *Cárdenas Maxán v. Rodríguez Rodríguez*, 125 DPR 702, 710-711 (1990).
[195] Rivera Román, Luis, *La Apreciación de Prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones, Perspectivas en la Práctica Apelativa*, Ediciones Situm 2018, pág. 91.

consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos".[196]

Igualmente, la Regla 110 de Evidencia previene que "será el juzgador de hechos quien deberá evaluar la prueba presentada con el propósito de determinar cuáles hechos fueron establecidos o demostrados".[197] De ese modo, es norma reiterada que cuando se le interpela a un foro apelativo que revise determinaciones de hechos, la *apreciación de la prueba*, en primer lugar, le corresponde al tribunal sentenciador debido a que estos tienen la oportunidad de observar y oír a los testigos, y por ello, están en mejor posición de evaluarla.[198] En ese sentido, la evaluación del foro sentenciador merece respeto y deferencia.[199]

Afín con ello, "los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego de admitir y aquilatar la prueba presentada durante el juicio".[200] En otras palabras, no debemos descartar las determinaciones "tajantes y ponderadas del foro de instancia" y sustituirlas por nuestra propia apreciación, a base de un examen del expediente del caso.[201]

Dicho esto, la deferencia al juicio del juzgador de hechos "no es absolut[a]" pues "[u]na apreciación errónea de la prueba no tiene credenciales de inmunidad" frente a nuestra facultad revisora.[202] Los foros apelativos podremos intervenir con la *apreciación de la prueba* cuando exista error manifiesto, pasión, prejuicio, parcialidad o cuando un análisis integral,

---

[196] 32 LPRA Ap. V, R. 42.2.
[197] 32 LPRA Ap. VI, R. 110.
[198] *Pueblo v. Hernández Doble*, 210 DPR 850, 864 (2022); Rivera Román, Luis, *op. cit.*, págs. 92–93; *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *López Vicil v. ITT Intermedia, Inc.*, 142 DPR 857, 865 (1997).
[199] *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011).
[200] *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009).
[201] *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Suárez Cáceres v. Com. Estatal Elecciones*, supra, págs. 65-66.
[202] *Ramos Acosta v. Caparra Dairy, Inc.*, 113 DPR 357, 365 (1982); *Vda. de Morales v. De Jesús Toro*, 107 DPR 826, 829 (1978).

detallado y minucioso de la prueba así lo justifique.[203] Ello sin olvidar que "la intervención indiscriminada con la adjudicación de credibilidad que se realiza a nivel de instancia significaría el caos y la destrucción del sistema judicial existente en nuestra jurisdicción".[204]

Respecto al prejuicio, pasión o parcialidad, existen si el juzgador "actúa movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna".[205] Consecuentemente, se consideran erróneas las conclusiones del tribunal apelado, si de un análisis de la totalidad de la prueba, el foro apelativo entiende que esta se distancia de la realidad fáctica o es inherentemente imposible o increíble.[206] Como resultado, el juez debe evitar cualquier distracción de alcanzar conclusiones tempranas durante la presentación de la prueba y debe aguardar con paciencia hasta escuchar la prueba de la parte adversa, para luego determinar los hechos esenciales del caso.[207]

Con ese propósito, la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba desfilada, lo cual incluye, entre otros factores, observar el comportamiento del testigo mientras ofrece su testimonio (demeanor) y escuchar su voz.[208] En consonancia, los tribunales apelativos no intervendremos con la *apreciación de la prueba*, la adjudicación de credibilidad y las determinaciones de hechos que realizan los tribunales de instancia, a menos que se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad o que incurrió en error manifiesto.[209] Cuando

---

[203] *Pueblo v. García Colón I*, 182 DPR 129 (2011); *González Hernández v. González Hernández, supra*, pág. 777.
[204] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018).
[205] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013).
[206] *Pueblo v. Irizarry*, 156 DPR 780, 816 (2002).
[207] Rivera Román, Luis, *op. cit.*, pág. 94.
[208] *Gómez Márquez et al. v. El Oriental*, 203 DPR 783 (2020).
[209] *Íd.*

la alegación es de pasión, prejuicio o parcialidad, los foros apelativos debemos verificar primordialmente si el juez de primera instancia cumplió su función de adjudicar de manera imparcial, pues solo así podremos descansar en sus determinaciones de hechos.[210]

De igual forma, el error manifiesto ocurre cuando, de un análisis de la totalidad de la evidencia, el foro revisor queda convencido de que se cometió un error, aunque haya evidencia que sostenga las conclusiones de hecho del Tribunal.[211] Este estándar de revisión restringe nuestra facultad para sustituir el criterio del tribunal primario a escenarios en que, de la prueba admitida, no exista base suficiente que apoye su determinación.[212] Resulta pertinente mencionar que, incluso, las diferencias de criterio jurídico no alcanzan ese estándar.[213]

En cuanto a la prueba testifical, procede nuestra intervención con la *apreciación de la prueba* o la adjudicación de credibilidad de los testigos en aquellos casos en que, luego de un análisis integral de la prueba, nos cause una insatisfacción o intranquilidad de conciencia tal que conmueva nuestro sentido básico de justicia.[214] Por ello, quien impugne una sentencia o resolución bajo estos parámetros deberá presentar evidencia sustancial que derrote la presunción de corrección que cobija la decisión del foro primario. Esto es, evidencia que en una mente razonable pueda aceptarse como adecuada para sostener una conclusión.[215]

Ahora bien, esta norma de deferencia no alcanza a la *apreciación de la prueba* documental o pericial realizada por el foro de primera instancia. En este contexto, la jurisprudencia del Tribunal Supremo ha sido consistente en que los foros revisores nos encontramos en igualdad de condiciones con el foro sentenciador para evaluar y apreciar la prueba documental admitida en

---

[210] *Íd.*
[211] *Íd.*
[212] *Íd.*, pág. 795.
[213] *Íd.*
[214] *Pueblo v. Cabán Torres,* 117 DPR 645, 648 (1986).
[215] *Vázquez Cintrón v. Banco Desarrollo,* 171 DPR 1, 25 (2007).

evidencia.[216] Además, nos encontramos facultados para adoptar nuestro criterio en la evaluación y *apreciación de la prueba* pericial, y hasta descartarla, aunque esta sea técnicamente correcta.[217]

## - III -

Los señores **GAUTIER MORALES** argumentan, en síntesis, que el tribunal de instancia incidió al: (1) no imponerle responsabilidad a la **A.E.E.** y desestimar, con perjuicio, la *Segunda Demanda Enmendada*; y (2) tomar en consideración hechos irrelevantes e impertinentes al caso e ignorar lo que se probó durante el juicio y establece la responsabilidad de la **A.E.E.** por sus daños.

De otro lado, la **A.E.E.** pondera que el tribunal apelado resolvió correctamente. Apúntala no tener ningún deber legal hacia los señores **GAUTIER MORALES**, dado que la causa directa de los daños sufridos por estos últimos fue su propia culpa y negligencia al entrar en propiedad ajena sin consentimiento del dueño, y ejercer actos de dominio no autorizados por ley.[218]

Como cuestión de umbral, precisamos resolver si la **A.E.E.** es o no responsable de los daños sufridos por los señores **GAUTIER MORALES**. Se desprende del expediente ante nuestra consideración, así como del propio testimonio del señor **NORIS JOEL GAUTIER MORALES** y sus testigos, que estos tenían y tienen pleno conocimiento de que el terreno en el cual penetraron era uno ajeno Además, desde septiembre de 2017, conocían las condiciones deterioradas (quebrado y con las varillas expuestas) en las que se encontraba el poste que yacía en dicho lugar.[219] El señor **NORIS JOEL GAUTIER MORALES** se expuso voluntariamente a cualquier daño que pudiera sufrir al transgredir en

---

[216] *Albino v. Ángel Martínez, Inc.,* 171 DPR 457, 487 (2007); *Díaz García v. Aponte Aponte,* 125 DPR 1, 13-14 (1989).

[217] *González Hernández v. González Hernández, supra,* pág. 777.

[218] Tampoco surge que estuvieran autorizados por el dueño del terreno.

[219] Véase las fotografías 4 y 5 anejadas al documento intitulado *Hallazgos de Visita al Área de Accidente del Sr. Noris Gautier en la Urb. Los Colobos Park en Carolina, P.R.*

el susodicho territorio y permanecer en las cercanías o inmediaciones del poste.[220]

Incluso, no se evidenció que el predio colindante a la propiedad inmueble del señor **NORIS JOEL GAUTIER MORALES** este afectada por alguna servidumbre a favor de la **A.E.E.** Tampoco que se haya suscrito una *Cesión, Traspaso y Garantía* transfiriendo dicho poste a la aludida corporación pública (**A.E.E.**) obligándole a operar, mantener y garantizar electricidad. Es más, los testigos de la **A.E.E.** constataron que el remanente es un solar destinado para una futura relocalización de la carretera 874.

Más aún, en el caso de marras, el tribunal apelado menciona la doctrina de *negligencia comparada* pero no aplicó la misma al no imputarle un porciento de responsabilidad a las partes. Ello pese a que la **A.E.E.** hizo *alegación fundamentada* de *negligencia comparada* en sus *Defensas Afirmativas.*[221] Ante el hecho de que dicho foro está en mejor posición para aquilatar y valorar la evidencia testifical y documental desfilada ante su consideración, se devuelve el caso para que individualice los porcientos de negligencia entre las partes. Esto es, le impute un porciento de responsabilidad a los señores **GAUTIER MORALES** y a la **A.E.E.**, respectivamente.

### - IV –

Por los fundamentos antes expuestos, ***revocamos*** la *Sentencia* dictada el 10 de enero de 2025 por el Tribunal de Primera Instancia, Sala Superior de Carolina. Se devuelve el caso a la consideración del foro *a quo* para realizar la valorización de los porcientos ante la negligencia comparada y determine la compensación de daños, si alguno. Al amparo de la Regla 18 (B) de nuestro Reglamento, el Tribunal de Primera Instancia puede proceder de

---

[220] Responsabilizar a todo dueño de terreno por las incidencias no previstas y ocurridas en su propiedad vulneraría nuestro sistema de derecho.

[221] *Semidey et al. v. Fcia. Belmonte et al.*, 211 DPR 222 (2023); Colón Santos v. Coop. Seg. Mult. P.R., 173 DPR 170, 178 (2008). H.M. Brau del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1986, Vol. I, pág. 410.

conformidad con lo aquí resuelto, sin que tenga que esperar por nuestro mandato.[222]

**Notifíquese inmediatamente.**

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[222] Véase la Regla 18 del Reglamento del Tribunal de Apelaciones, según enmendada, *In Re Aprob. Enmdas. Reglamento TA*, 2025 TSPR 141, pág. 36, 216 DPR ____ (2025). La Regla 18 sobre el *Efecto de la presentación del escrito de apelaciones en casos civiles* dispone: (A) **Suspensión** Una vez presentado el escrito de apelación, se suspenderán todos los procedimientos en el Tribunal de Primera Instancia respecto a la sentencia, o parte de esta, de la cual se apela, o a las cuestiones comprendidas en esta, salvo órden en contrario expedida por iniciativa propia o a solicitud de parte por el Tribunal de Apelaciones, pero el Tribunal de Primera Instancia podrá proseguir el pleito en cuanto a cualquier cuestión no comprendida en la apelación. (B) **Cuando no se suspenderá** No se suspenderán los procedimientos en el Tribunal de Primera Instancia cuando la sentencia dispusiere venta de bienes susceptibles de pérdida o deterioro. En ese caso el Tribunal de Primera Instancia podrá ordenar que dichos bienes sean vendidos y su importe depositado hasta tanto el Tribunal de Apelaciones dicte sentencia. **No se suspenderán los efectos de una decisión apelada, salvo una orden en contrario** expedida por el Tribunal de Apelaciones, por iniciativa propia o a solicitud de parte, cuando ésta incluya cualesquiera de los remedios siguientes: (1) una orden de *injunction*, de *mandamus* o de hacer o desistir; (2) una orden de pago de alimentos; (3) una orden sobre custodia o relaciones filiales (énfasis nuestro).